[991 NYS2d 735]

NORRIS HUGGINS, Petitioner, v JULIAN RANDOLPH et al., Respondents.

Civil Court of the City of New York, Kings County, July 10, 2014

### APPEARANCES OF COUNSEL

*Ashley Richmond*, respondent pro se.

*Julian Randolph*, respondent pro se.

*Davis, Ndanusa Ikhlas & Saleem, LLP*, Brooklyn (*Tarik Davis* of counsel), for petitioner.

**OPINION OF THE COURT**

Susan F. Avery, J.

In this licensee proceeding, respondent, Ms. Ashley Richmond, moves by order to show cause to stay execution of the warrant of eviction. Respondent, Mr. Julian Randolph, is the son of the petitioner. Respondent movant, Ms. Ashley Richmond, is the mother of two of the petitioner's grandchildren.[1] Petitioner is the tenant of record of the premises which are the subject of this action. Counsel for the petitioner previously informed the court that the petitioner is 72 years of age.

Previously, counsel for petitioner moved for summary judgment.[2] In his affidavit in support of his motion for summary judgment, petitioner stated that he feared his son and that he cannot return home until his son is removed from the premises. He stated that "my son has in the past threatened my health and safety, forced me to sign a power of attorney and taken other steps to put me in fear of him."[3]

Additionally, in support of his motion for summary judgment, petitioner submitted an affidavit of Ms. Martha John. In her affidavit, Ms. John stated that she is the owner of the building in which the subject premises are located, and that Mr. Huggins is her brother, and has been the tenant of record at the premises since before March of 2007 (¶¶ 2-3) (prior to her ownership of the building).

In opposition to petitioner's motion for summary judgment, respondents orally argued that the allegations in petitioner's affidavit are incorrect and that "an aunt of theirs" (presumably Ms. John) forced petitioner to commence this proceeding.

As the petitioner met his evidentiary burden, this court granted summary judgment in petitioner's favor and permitted the warrant of eviction to issue forthwith. Noting that elder abuse is alarmingly on the rise, this court declined to stay execution of the warrant.

---

1. The court file demonstrates that respondent, Mr. Randolph, is the son of the petitioner. However, the relationship between the corespondents to each other has not been precisely defined, therefore, this court will refer to them as either corespondents or partner(s).

2. Prior to moving for summary judgment, the respondents demanded a traverse hearing on the issue of service of process. The matter was referred to a trial part where a hearing was held, which resulted in a finding that respondents were properly served with process (*see* decision of Judge McClanahan dated Oct. 15, 2013). The matter was then referred back to this resolution part for further proceedings.

3. Aff of Norris Huggins, Mar. 24, 2014, ¶ 4.

The markings on the court file indicate that the warrant of eviction issued on June 6, 2014. Subsequently, respondent, Ms. Ashley Richmond, filed an order to show cause seeking a stay of execution of the warrant of eviction. The application was returnable on June 26, 2014. On that date, petitioner failed to appear. However, since service of the order to show cause was untimely, this court denied the motion. Ms. Richmond then filed the instant order to show cause seeking a further stay of the execution of the warrant of eviction.

Because of the seriousness of the allegations Ms. Richmond asserted in her applications, this court will consider all of Ms. Richmond's submissions in reaching the instant decision.

In support of her prior application, movant attached two unnotarized documents in addition to her affidavit. As the documents are not notarized, they are of nominal evidentiary value. However, because in this proceeding there are serious allegations of a senior in fear of returning to his home as a result of the respondents' behavior, coupled with the strong statements contained in the documents, these allegations will be considered by the court.

The first document submitted with Ms. Richmond's initial application is a letter, purported to be signed by Mr. Clayton A. John. Mr. John claims to be the landlord of the subject premises and states that he has not seen Mr. Julian Randolph at the premises since April 29, 2014.[4] At oral argument on July 8, 2014, Ms. Richmond requested to submit into evidence additional statements that she claimed support her contention that Mr. Randolph no longer resides at the premises. As discussed below, since Mr. Randolph's occupancy at the premises is irrelevant to the determination of this court, this court declined to accept the document(s) into evidence.

The second document submitted by Ms. Richmond in her prior application is a two-page statement, with her name appearing on the bottom of the second page above a signature line. This court finds the assertions in her statement, as well as the allegations in her affidavit, to be quite disturbing.

In her affidavit in support of her prior application, Ms. Richmond stated that the corespondent, "Julian Randolph does not reside in the apartment anymore and I have further proof of perjury by the petitioner" (¶ 3). Additionally, Ms. Richmond

---

4. Mr. John does not explain how he can recall the exact date that he last saw Mr. Randolph at the premises.

states "I have clear evidence of perjury on the petitioner's behalf" (¶ 3). Similarly, the last sentence of the first paragraph of her two-page statement reads as follows: "I have discovered evidence that proves the petitioner has committed perjury." In the next paragraph, Ms. Richmond states:

"On 10/14/2013[5] Julian, our children and I visited Norris at the hospital. At that time we spoke clearly about the details about this case. Both parties consented to a recording. In this recording[6] that is 8 min. 35 sec. Norris Huggins clearly states that he is not and has never been in fear of his life. Norris also states that he never told his lawyer that he was in fear."

The third paragraph of Ms. Richmond's statement claims that Mr. Randolph no longer resides at the premises and has not resided at the premises since April 29, 2014.[7] Ms. Richmond then concludes that "even if Norris changes his mind about being in fear of his son, the 'fear' has been removed. Norris is welcome to be in his apartment and always has been. His sister Martha John is threatening Norris to evict his son and family [based upon her jealousy]."[8]

In the second to last paragraph of her statement, Ms. Richmond states: "I personally have been nothing but kind to Norris by going above and beyond to ensure his well being . . . at the time I was caring for Norris everyday, I was pregnant."

In the affidavit in support of the application currently before the court, Ms. Richmond states: "I am asking to be able to stay at the residence based on I have proof [sic] of perjury on the petitioner's behalf" (¶ 3); and "Julian moved to CA because we separated due to the extreme amount of stress this case has put on our family and relationship" (¶ 4).

---

**5.** This court notes that this date is one day before Judge McClanahan held a traverse hearing, where he found service of process was proper (*see* n 2, *supra*).

**6.** To the extent a recording may exist, the contents thereof bear no relevance to the instant determination.

**7.** This court's recollection, is that at oral argument on petitioner's summary judgment motion, on April 9, 2014, Mr. Randolph stated that he was not willing to agree to vacate the premises, yet less than three weeks later, Ms. Richmond claims that "Julian moved to California on 4/29/14" (*see* two-page statement of Ms. Richmond ¶ 3).

**8.** On the second page of her two-page statement Ms. Richmond states that Ms. John has a son who "is currently serving 20 years for murder" and therefore she is jealous of petitioner's relationship with his son (corespondent, Mr. Randolph) and forcing him (petitioner) to bring this action (*see also* two-page statement of Ms. Richmond at 1 [last sentence]).

Combining Ms. Richmond's submissions in support of her applications, Ms. Richmond believes that she is entitled to continued occupancy of the premises because: (1) Mr. Randolph, the source of petitioner's fear, moved out; (2) petitioner lied (presumably about being in fear of Mr. Randolph); (3) at some point, Ms. Richmond was petitioner's daily caretaker; and (4) as a result of commencing this action, petitioner caused her and Mr. Randolph to separate.

Notwithstanding the strong language in her submissions, at oral argument, Ms. Richmond, seemed to soften her position and requested three months to vacate the premises.

Petitioner orally opposed respondent's application. Counsel for the petitioner stated that his client did not authorize him to agree to provide respondents any additional time to vacate the premises. Additionally, Mr. Davis, counsel for the petitioner, strongly objected to granting respondents three months to vacate the premises.

Following petitioner's oral opposition to Ms. Richmond's request for a three-month stay of execution of the warrant of eviction, Ms. Richmond then requested two months to vacate. Ms. Richmond gave no reason for her change of mind and her current willingness to vacate the premises. However, as the parties were unable to enter into a stipulation, this court adjourned the matter from July 8, 2014 to July 10, 2014, for the court to issue its decision on the record.

Previously in a decision dated April 9, 2014, this court granted petitioner's motion for summary judgment. This court's decision not to grant any stay of execution of the warrant of eviction was largely based upon the petitioner's allegations of elder abuse. It must be emphasized that

> "[t]he protection of elderly persons from abuse and exploitation is a matter of significant public concern. '[E]lder abuse, including the financial exploitation of elderly individuals . . . is an often well hidden problem, in part because the perpetrator of such conduct is in many cases a member of the victim's family.' "[9]

While "[e]fforts to redress elder abuse are still in their infancy,"[10] "[e]ffective interventions can prevent or stop elder

---

**9.** *Matter of Mabel R. v Rayshawn D.*, 33 Misc 3d 1023, 1027 (Fam Ct, Queens County 2011), citing *Campbell v Thomas*, 73 AD3d 103 (2d Dept 2010), and *Boyce v Fernandes*, 77 F3d 946 (7th Cir 1996).

**10.** *Matter of Doar (L.S.)*, 39 Misc 3d 1242(A), 2013 NY Slip Op 50988(U), *10 (Sup Ct, Kings County 2013).

abuse.''[11] Indeed, ''[i]n cooperation with the New York City Police Department, Adult Protective Services ('APS'), the New York City Department for the Aging, medical professionals and social service agencies, the [Elder Abuse Unit of the New York County District Attorney's] Office investigates and prosecutes all kinds of crime involving elderly victims.''[12] Additionally, ''[i]f our community is serious about protecting its most vulnerable adults, new initiatives and coordinated strategies must . . . be developed and implemented.''[13]

Many states recognize an independent cause of action predicated upon an allegation of elder abuse.[14] While the Penal Law of New York State makes it a crime for a caretaker to endanger the welfare of a vulnerable senior person,[15] New York State does not have a statute recognizing an independent civil cause of action predicated upon an allegation of elder abuse.[16] However, case law supports, that the courts, as part of the community, need not wait for the enactment of such a statute. Rather, as ordered by Justice A. Gail Prudenti, as the Presiding Justice of the Appellate Division, ''[i]t is 'an old, old principle' that a court, 'even in the absence of express statutory warrant,' must not 'allow itself to be made the instrument of wrong.' ''[17] Therefore, in compliance with Justice Prudenti's mandate in *Campbell*, it is incumbent upon judges and court personnel to recognize the signs of possible elder abuse and act to protect society's vulnerable seniors[18] (a vulnerable elderly person, as defined by the Penal Law is ''a person sixty years of age or

**11.** American Psychological Association, Office on Aging, Elder Abuse & Neglect: In Search of Solutions at 3 (2012), available at http://www.apa.org/pi/aging/resources/guides/elder-abuse.pdf.

**12.** *See* The New York County District Attorney's Office, Resources for Victims of Elder Abuse, http://manhattanda.org/resources-victims-elder-abuse.

**13.** *Matter of Doar (L.S.)*, 39 Misc 3d 1242(A), 2013 NY Slip Op 50988(U), *10 (Sup Ct, Kings County 2013).

**14.** James L. Buchwalter, Annotation, *Validity, Construction, and Application of State Civil and Criminal Elder Abuse Laws*, 113 ALR5th 431.

**15.** Penal Law §§ 260.31, 260.32.

**16.** *Campbell v Thomas*, 73 AD3d 103, 105 (2d Dept 2010) (''New York, however, does not yet have a statute specifically addressing [this] situation'').

**17.** *Campbell v Thomas* at 119.

**18.** For a comprehensive listing of laws throughout the United States addressing elder abuse and neglect, see National Research Council (US) Panel to Review Risk and Prevalence of Elder Abuse and Neglect, Elder Mistreatment: Abuse, Neglect, and Exploitation in an Aging America, Appendix B (Richard J. Bonnie & Robert B. Wallace editors 2003), available at http://www.ncbi.nlm.nih. gov/books/NBK98799/.

older who is suffering from a disease or infirmity associated with advanced age").[19]

In *Campbell*, the court addressed the issue of a 72-year-old man, suffering from diminished mental capacity, who was taken advantage of by a person in a position of trust. Similarly, in the case at bar, this court is called upon to address the special needs of a 72-year-old man who alleges that a member of his immediate family has abused him. Accordingly, in compliance with the requirement of the current Chief Administrative Judge, this court deems petitioner, Mr. Huggins, to be a potential vulnerable senior. This court so rules, notwithstanding, that, unlike the elder in *Campbell*, there is nothing before the court to indicate that Mr. Huggins is suffering from a particular symptom or symptoms, associated with advanced age.[20]

In the case at bar, petitioner, a vulnerable senior, states that he is in fear of his son and that his son forced him to sign a power of attorney. The court record reflects that petitioner's son, his son's partner (the respondents) and their children, moved into the petitioner's home and resided therein with the petitioner. Although the record is not clear as to when Mr. Huggins first began to fear his son, Mr. Huggins currently maintains that he fled his home as a result of that fear, and feels that he cannot return to the home in which he has resided since prior to March of 2007, until his son and all other occupants are removed from the premises.

The "[a]buse of elders takes many different forms."[21] It can be physical (using force to injure or impair an elder); financial (forcing an elder to sign a power of attorney); neglectful (neglecting the needs and wishes of an elder); and emotional (causing an elder to feel ashamed or belittled).[22] Additionally, it is widely held that "[e]lder abuse tends to take place where the

---

**19.** Penal Law § 260.31 (3).

**20.** Additionally, the burden of proof in a criminal proceeding is the higher standard of proof beyond a reasonable doubt, whereas in civil proceedings, the burden of proof is the lesser standard of proof by a preponderance of the evidence.

**21.** *See* Lawrence Robinson, Joanna Saisan & Jeanne Segal, Elder Abuse & Neglect: Warning Signs, Risk Factors, Prevention, and Reporting Abuse, http://www.helpguide.org/mental/elder_abuse_physical_emotional_sexual_neglect.htm (last updated Feb. 2014).

**22.** *See* New York State Office of Children and Family Services, Adult Protective Services, Definitions of Adult Abuse, http://www.ocfs.state.ny.us/main/psa/adultabuse.asp.

senior lives: most often in the home where abusers are often adult children"[23] and often by caretakers.[24]

As a result of the many forms of elder abuse, this court finds it quite disturbing that Ms. Richmond states, that because Mr. Huggins claimed that he "fear[ed] . . . his son, [and] the 'fear' has been removed [since his son moved out in Apr.] . . . Norris is welcome to be in his apartment and always has been."[25] Ms. Richmond's conclusion demonstrates a lack of understanding and sensitivity to the needs of this potential vulnerable senior as well as a misunderstanding of the law.

Mr. Huggins wants to return to the home that he has known since before he invited his son and his son's partner to reside there with him. Ms. Richmond's conclusion that Mr. Huggins is free to return to the premises because Mr. Randolph moved out, therefore the reason for the "fear" no longer exists, demonstrates that she fails to grasp, that as long she remains at the premises, regardless of whether Mr. Randolph is there, that the home Mr. Huggins knew is not *HIS* home. Mr. Huggins has the right to live in his home with the occupants of his choosing, or if he so chooses, no other occupants at all. Mr. Huggins is entitled to be the sole decision maker as to which guests, if any, are invited into his home.

As Mr. Huggins chose to bring this action against his son and his son's partner, this court can only conclude that he will be "welcome to be in his apartment" when it is free of all occupants.

While Ms. Richmond states "I was caring for Norris everyday" this court takes no position as to whether she falls within the definition of a caretaker. This court deems Ms. Richmond's insensitivity to Mr. Huggins desire to live in the home that he once knew, in the way that he once knew it, to be neglectful of Mr. Huggins' wishes.

Ms. Richmond's assertions that she can prove that the 72-year-old petitioner committed perjury because she has a "tape

---

**23.** *See* Lawrence Robinson, Joanna Saisan & Jeanne Segal, Elder Abuse & Neglect: Warning Signs, Risk Factors, Prevention, and Reporting Abuse, http://www.helpguide.org/mental/elder_abuse_physical_emotional_sexual_neglect.htm (last updated Feb. 2014).

**24.** See Penal Law § 260.32 stating that it is a crime for a caretaker to "endanger[ ] the welfare of a vulnerable [senior] person." The "results of one study indicate that in approximately 65% of substantiated cases of elder abuse, the alleged offender was an 'adult child,' [or] 'other family member' . . . of the victim" (*Campbell v Thomas*, 73 AD3d 103, 104 n 1 [2d Dept 2010]).

**25.** Two-page statement of Ms. Richmond ¶ 3.

. . . which demonstrates that Mr. Huggins did not fear his son" is irrelevant to petitioner's superior right to possession of the premises.[26] Mr. Huggins, as the tenant of record, has the right to revoke the respondents' licence to occupy the premise, regardless of fear.

The 72-year-old petitioner wanted respondents to move out of his apartment. He hired a lawyer to achieve this goal. A predicate notice requiring respondents to vacate the premises was served. Respondents failed to vacate the premises. A notice of petition and petition seeking possession of the premises was then served. Respondents did not vacate the premises or stipulate to vacate by a date certain. Rather, respondents demanded a traverse hearing.[27] Clearly, respondents believe that their needs are superior to the needs of the 72-year-old petitioner, a senior, who opened his home to respondents and respondents' family.

Moreover, following the issuance of the warrant of eviction, respondent, Ms. Richmond, filed documents with the court accusing the 72-year-old petitioner of committing the serious crime of perjury[28] as well as being the cause of the breakup of her partnership with Mr. Randolph. Being accused of criminal behavior[29] as well as being blamed as the reason for the breakup of a relationship, may cause the person being so accused, to feel ashamed and belittled.

This court does not begrudge respondents their rights to defend this action, demand a traverse or refuse to voluntarily vacate the premises. Nor does this court begrudge respondents their right to file as many order to show cause applications as they deem appropriate and seek as many stays of the execution of the warrant of eviction as respondents deem fit. Similarly,

---

**26.** Although Ms. Richmond expressed to this court that she is willing to vacate the premises, at oral argument on her current order to show cause, on July 8, 2014, Ms. Richmond sought to submit the "perjury proving tape" into evidence. This court denied Ms. Richmond's request.

**27.** *See* n 2, *supra*.

**28.** "[F]irst-degree perjury, [is] a class D felony." (*People v Perino*, 76 AD3d 456, 460 [1st Dept 2010]; Penal Law § 210.15.)

**29.** It is also troubling to this court that based upon the claimed statements on the tape, Ms. Richmond accuses the 72-year-old petitioner of committing the crime of perjury. Ms. Richmond could have just as readily concluded that petitioner merely wanted a peaceful hospital visit with his family, and wished to enjoy his time with his grandchildren while he was recuperating in the hospital, so he made such statements to ensure a pleasant family visit. Indeed, this is a much kinder and sensitive explanation of such statements.

respondents have the right to express their beliefs (the facts as they see them) in support of their applications seeking stays of the warrant of eviction. However doing so, gives this court reason to pause.

Respondents' willingness to publicly act contrary to petitioner's wishes before this court, and to cause petitioner possible public shame by stating in court documents[30] that the petitioner caused their breakup, and committed a serious crime, may be illustrative of the way respondents treat petitioner in private, behind closed doors, in the subject premises, in his home. Based upon the foregoing, it is within this court's purview to conclude that Mr. Huggins is not being treated with the respect and dignity that he deserves.[31] The current situation is unhealthy for this 72-year-old petitioner, and must not continue.

Based upon the foregoing, the respondent has failed to assert a meritorious defense to this action, nor set forth a basis for any further stays in this proceeding.

Accordingly, in the interest of justice, the respondent's order to show cause is denied, stays are vacated, warrant may execute following service of the marshal's notice, to give respondents an opportunity to vacate the premises with dignity.

---

**30.** Court documents are a matter of public record.

**31.** This court is mindful that family dynamics can be complicated, and in some families the dynamics are more complicated than others, however, this court would be doing a disservice to the public it is duty bound to serve and protect, if it permitted the family members of this senior, to continue to mistreat this elder.